UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR ONLINE PUBLICATION ONLY

FRIENDS OF ANIMALS,

                                 Plaintiff,

- versus -

WILLIAM CLAY, in his official capacity as a Deputy Administrator in the Department of Agriculture,

ANIMAL AND PLANT HEALTH INSPECTION SERVICE, an agency of the United States; and

U.S. FISH AND WILDLIFE SERVICE, an agency of the United States,

                                 Defendants.

MEMORANDUM
AND ORDER
13-CV-7293 (JG)

A P P E A R A N C E S:

    FRIENDS OF ANIMALS
        PO Box 102041
        Denver, CO 80250
  By:    Jennifer Barnes
        *Attorneys for Plaintiff*

    LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, NY 11201
  By:    Margaret M. Kolbe, of counsel
        *Attorney for Defendants*

JOHN GLEESON, United States District Judge:

        Plaintiff Friends of Animals ("FoA") brings this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq., challenging the defendants' actions in approving and helping to carry out a plan by which birds are killed at John F. Kennedy International Airport

("JFK") in order to prevent their interference with aircraft. Two defendants – William Clay, a Deputy Administrator in the Department of Agriculture, and Animal and Plant Health Inspection Service ("APHIS") – have moved to dismiss the complaint for lack of standing. All three defendants, including U.S. Fish and Wildlife Service ("FWS"), have also moved for summary judgment on the merits based on the administrative record.

For the reasons that follow, defendants' motion to dismiss is denied, and defendants' motions for summary judgment are granted.

## BACKGROUND

The Port Authority of New York and New Jersey ("PA"), which is not a party to this case, operates JFK, located just within the bounds of New York City on the southern shore of Long Island. The airport is located immediately next to Jamaica Bay and the Jamaica Bay Wildlife Refuge. The Federal Aviation Administration ("FAA") has implemented regulations requiring airports to manage "wildlife hazard[s]," including the dangers presented when planes strike wildlife or ingest animals into their engines, or when animals are present in such numbers that there is a risk of such incidents. *See* 14 C.F.R. § 139.337. The PA has adopted a so-called "Bird Hazard Reduction Program" ("BHRP") to comply with these regulations and ensure safe airplane traffic at JFK. The first version of the current BHRP was adopted in 1994 and focused on the risks to aircraft posed by gulls; it was embodied in an "environmental impact statement" ("EIS") required by the National Environmental Policy Act ("NEPA"). In 2012, amendments to the BHRP were finalized, including plans to control risks from many other bird species; this was

2

done by means of a supplemental environmental impact statement ("SEIS"). *See* APHIS_1-APHIS_483.[1]

The Secretary of Agriculture is "authorized . . . to conduct activities and to enter into agreements with States, local jurisdictions, individuals, and public and private agencies, organizations, and institutions in the control of nuisance mammals and birds . . . ." 7 U.S.C. § 426c. That authority is delegated to the federal Animal and Plant Health Inspection Service ("APHIS"), an agency of the Department of Agriculture. *See* 7 C.F.R. § 2.80(a). In turn, Wildlife Services ("WS"), which is a component of APHIS,[2] conducts animal control activities, including those at JFK. Animal control activities are authorized under so-called "cooperative service agreements" with local institutions and governments. Here, WS has entered into such an agreement with Port Authority: Since 1991, WS has had personnel present at JFK to shoot birds. *See* APHIS_43. Furthermore, WS has had a substantial role in designing the current bird control activities at the airport: it took the lead in authoring the original 1994 EIS. *See* APHIS_1342. WS also led the effort to expand and adapt the program, starting in 2006, and culminating in the 2012 SEIS. *See See* APHIS, "Supplemental Environmental Impact Statement for Gull Hazard Reduction Program at John F. Kennedy International Airport," 71 Fed. Reg. 16547 (April 3, 2006).

Broadly, the SEIS proposes six alternatives to remedy the perceived shortcomings of the original BHRP: keeping the same measures already in place; adding some nonlethal bird-management methods both on and off the airport grounds; adding new on-airport lethal controls;

---

[1] Citations to the administrative record are made in the consecutive pagination format in which the documents were produced. APHIS's materials are on the docket at entries 16 through 32; FWS's are primarily exhibits to docket entry 15.

[2] Wildlife Services is entirely distinct from the U.S. Fish and Wildlife Service, an agency with the U.S. Department of the Interior, and a codefendant in this case. *See* http://en.wikipedia.org/wiki/Mimicry.

adding new off-airport lethal controls; reducing or relocating a laughing gull colony close to the airport; or do all of the above except for managing the laughing gulls. *See, e.g.,* APHIS_10- AHPIS_13. The final alternative was the one chosen.

Also relevant to this case is the Migratory Bird Treaty Act, federal legislation that implements several bilateral treaties about migratory birds. The MBTA protects covered migratory birds from numerous activities, including especially hunting or other killing, but authorizes those activities under limited circumstances. FWS is empowered under the MBTA to issue depredation permits and depredation orders, two distinct authorizations that let entities kill protected birds. FWS has long issued the Port Authority depredation permits for taking migratory birds at JFK; the two permits relevant to this case were issued on February 5, 2013, and on June 11, 2014. *See* 2013 permit, FWS_1520-21, DE 15-20; (2014 permit), FWS_2168-72, DE 37-3.

In December of 2013, Port Authority personnel shot and killed three snowy owls pursuant to permits issued by both FWS and the New York State Department of Environmental Conservation. This lawsuit followed.

## DISCUSSION

A.  *Standard of Review under the APA*

Plaintiff's causes of action in this case arise under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that the court finds to be, inter alia, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In APA cases, a reviewing Article III court decides questions of law de novo. *See id*. § 706 ("[T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory

4

provisions, and determine the meaning or applicability of the terms of an agency action."). The court should only disturb conclusions of fact if they are "unsupported by substantial evidence," *id*. § 706(2)(E), which "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Fund for Animals v. Kempthorne*, 538 F.3d 124, 132 (2d Cir. 2008) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951)).

As to the agency's overall decision, "[t]he task of the reviewing court . . . is to determine whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action including whether there is a 'rational connection between the facts found and the choice made.'" *J. Andrew Lange, Inc. v. F.A.A.*, 208 F.3d 389, 391 (2d Cir. 2000) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)).

B.  *NEPA*

One of FoA's claims in this case is that agency action must be set aside under the APA because the action failed to comply with the procedural requirements put in place by the National Environmental Policy Act. NEPA requires an agency to issue an environmental impact statement before taking administrative action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). As the Second Circuit explained in *Fund for Animals v. Kempthorne*,

> NEPA is a procedural statute that mandates a process rather than a particular result. It does not command an agency to favor any particular course of action, but rather requires the agency to withhold its decision to proceed with an action until it has taken a 'hard look' at the environmental consequences. The court's role is to ensure that NEPA's procedural requirements have been satisfied, not to interject itself within the area of discretion of the executive as to the choice of the action to be taken.

538 F.3d at 137 (internal quotation marks, citations, and alterations omitted).

C. *Standing*

Defendants APHIS and its administrator, William Clay, have moved to dismiss this action for lack of standing. As a general matter, a plaintiff must meet three requirements to have standing consistent with Article III of the United States Constitution:

> First, the plaintiff must have suffered an "injury in fact," – that is, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Second, "there must be a causal connection between the injury and the conduct" of which the plaintiff complains. And third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 449-50 (2d Cir. 2014) (internal citations omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Although FoA's briefing addresses the injury and causation requirements, the defendants' really only argue that plaintiffs cannot show redressabilty, the third *Lujan* requirement. The purpose of the redressability requirement is similar to that of the mootness doctrine. Unlike some other court systems, our federal courts do not make abstract declarations of rights; we only decide particular cases and controversies, with the effect (familiar in the common law system) of establishing legal principles as we go. If, despite a court's declaration of rights, the plaintiff's injury would continue, then the plaintiff cannot pursue such "relief" in federal court.

It is the plaintiff's burden to demonstrate redressability, but "[a] plaintiff need not demonstrate with certainty that her injury will be cured by a favorable decision." *E.M.*, 758 F.3d at 450. Rather, "she must at least make a showing that there is a 'substantial likelihood that the relief requested will redress the injury claimed.'" *Id*. (quoting *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.,* 438 U.S. 59, 75 n. 20 (1978)).

6

Clay and APHIS contend that even if I enjoined them from participating in wildlife control activities at JFK, that would not eliminate the plaintiffs' alleged injury. That is because although personnel from WS (an organization within APHIS) have carried out some of the shooting, the Port Authority is actually responsible for administering the BHRP and keeping the air clear and safe near JFK. APHIS personnel are present only under what is effectively a contract – the Cooperative Service Agreement, APHIS_6892-6908. Furthermore, these defendants contend, if WS were enjoined, PA would still find some entity to carry out the BHRP. PA is under a federal legal obligation to continue managing bird hazards at JFK, and in any event, it is concerned about safe air travel at JFK.

Defendants' arguments have some force, but I conclude that FoA has shown enough here to satisfy Article III. Defendants correctly point out that the Port Authority, which in many ways is the most important actor, is not a party to the case. Even more strongly, PA is not a federal agency or actor, and it is not directly subject to the laws (NEPA and the APA) sought to be enforced here. But the fact that the ultimate relief a party seeks depends in part on a third party's actions is not an insurmountable barrier to standing. For example, the Supreme Court has stated that when a favorable ruling would change a party's legal status, which would in turn create "a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered" from a third party, that is enough for standing. *Utah v. Evans*, 536 U.S. 452, 464 (2002). Wright and Miller note that standing has been found in cases not only where a third party would be forced to act based on a decision affecting a defendant in the case, but even where "[t]he defendant may have some authority that enables it to influence, or perhaps command, desired behavior by the nonparty." Wright et al., 13A Fed. Prac. & Proc. Juris. § 3531.6 (3d ed. 2014 Suppl).

7

The potential injury FoA identifies – a disruption of the aesthetic interest of observing birds in the vicinity of the airport, undisturbed by lethal actions against them, *see* First Amended Complaint ("FAC") ¶ 13, DE 5 – could be diminished by preventing WS from participating in the BHRP, even if killing were not totally stopped. This is so for several reasons. WS played the leading role in developing both the original BHRP (as embodied in the 1994 EIS) and the amended BHRP. The permit under which WS operates does refer to other parties, such as private contractors, who are authorized to take birds and therefore fulfill some of WS's role. *See* FWS_1527. But those references are vague, and SEIS contemplates that WS will provide primary staffing for lethal takes. WS was not just brought in after the fact to carry out some plan; WS is implementing its own plan about which it has expertise developed over the last twenty years. Furthermore, the PA currently pays WS more than $700,000 a year in contractual fees to assist in carrying out the BHRP, APHIS_6894, so it seems that at a minimum, PA would need to rethink its allocation of resources. PA might wish to consider other alternatives if the plan that has been in effect for more than twenty years is interrupted; it might not be possible to find a contractor for the same price. Under these circumstances, an order entered against WS would have a "substantial likelihood" of disrupting the BHRP and, as FoA puts it, might cause the "cessation of at least some killing." FoA Br. at 11. It is not clear that in the long run, an order in FoA's favor against APHIS and Clay would end lethal actions against birds outright. But it is not speculative to think that there would be some reduction, and I conclude that this is sufficient for Article III standing.

D.  *Merits of the APA/NEPA Claim against APHIS and Clay*

Much of the plaintiff's argument on its NEPA claim against APHIS and Clay focuses on the SEIS's purported lack of species-specific information and analysis. *See* FAC ¶ 74

8

("[T]he [SEIS] contains no information regarding whether certain bird species might be handled as effectively using non-lethal measures in lieu of lethal controls. In short, the FSEIS fails provide sufficient information so that one could understand what methods might actually be used in various situations or with a specific bird species."). FoA also argues that APHIS violated NEPA by failing to adequately consider the effect of lethal action on bird populations in the area, SAC ¶ 75, and failing to consider "the possibility that adding to lethal population control methods will worsen rather than reduce the total risks posed by aircraft collisions with birds," SAC ¶ 76.

At the outset, I agree with FoA that the SEIS does not on its face provide information by species describing when (if at all) a given species might be dealt with in a nonlethal way. The SEIS does provide species-specific information about animals that present a danger of strikes at JFK, *see* SEIS 1.7, APHIS_57-APHIS_94, but each section describes the behavior of each species, the frequency of strikes, and the danger the species presents, not the measures that work for each species. Only in later sections – particularly Chapter 4 of the SEIS, which evaluates alternatives' feasibility and efficacy, and Chapter 6, which predicts the environmental impact of each alternative – does the SEIS discuss whether particular control methods work for particular species, and then only sporadically.

Furthermore, I agree with FoA that APHIS was required to take a "hard look" at the impact of the BHRP program (and especially the lethal components of the program) on birds, since birds are indisputably part of the "human environment" that NEPA protects. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. 1508.14 ("Human environment shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment.").

But FoA has not demonstrated *why* NEPA is violated by APHIS's failure to give consistent species-specific analysis on which nonlethal methods might be effective for each species. The argument would be more persuasive if FoA could show that APHIS was required by law to prioritize nonlethal control methods as a substantive matter. But it has not done so, because NEPA does not demand particular substantive results. It requires only that APHIS assess and discuss the impact of the proposed control methods on the population of each species. *See, e.g., Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989) ("The sweeping policy goals announced in § 101 of NEPA are thus realized through a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences, and that provide for broad dissemination of relevant environmental information. Although these procedures are almost certain to affect the agency's substantive decision, . . . NEPA itself does not mandate particular results, but simply prescribes the necessary process.") (internal citations and quotation marks omitted).[3]

The SEIS contains species-specific sections that discuss the likely impact of each proposed control alternative (on- and off-airport, lethal and nonlethal methods) on affected species' population. *See, e.g.,* APHIS_256-AHPIS_290 (analyzing effects by species of previous program). Furthermore, SEIS's discussion of each management alternative includes analysis of the particular species targeted or most likely to be affected. For example, the off-airport lethal take alternative is only directed at several large species (such as Canada geese and mute swans). *See* APHIS_321-324. These analyses were species-specific and demonstrate that the forms of

---

[3] Nor has FoA established that the MBTA or its regulations (or other protected statuses for particular birds) by themselves require minimizing lethal actions against birds any more than the current program does.

bird hazard management are tailored to the species in question. That is enough to constitute a "hard look" under NEPA.[4]

I am also not persuaded that APHIS did not consider a range of reasonable alternatives. While it is true that NEPA requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14, the "range of alternatives that must be discussed is a matter within an agency's discretion," *Friends of the Ompompanoosuc v. Federal Energy Regulatory Commission*, 968 F.2d 1549, 1558 (2d Cir. 1992). Here, APHIS did consider a wide range of alternatives, including many nonlethal methods. And, as defendants now point out, the revised BHRP does give a qualified priority to nonlethal means. *See* APHIS_13.

I understand FoA's concern that the BHRP does not prioritize nonlethal methods, and I hope that APHIS and the PA can find tools to diminish the danger to planes without killing so many birds. But ultimately, I am persuaded that APHIS was sufficiently thorough in its SEIS to satisfy the requirements of NEPA and the APA.

E.  *Merits of APA/MBTA Claim against FWS*

FoA contends that FWS's issuance of the 2013 and 2014 permits[5] violated the APA because FWS exceeded its authority under the Migratory Bird Treaty Act and relevant regulations. I conclude that FoA's arguments are without merit.

---

[4] I also reject FoA's argument that more specific information was required in order to show that the revised BHRP was within APHIS's legal power. The statutory grant of authority is broad, and permits the agency to "conduct a program of wildlife services with respect to injurious animal species and take any action the Secretary considers necessary in conducting the program." 7 U.S.C. § 426. The SEIS adequately describes how the bird species in question are "injurious," since even small birds can present a risk to aircraft, and large ones present a major risk. *See, e.g.,* APHIS_436-37 (describing risks from birds under four pounds in size); *see also* 1994 EIS at APHIS_1524-1525 (describing hazards from birds of many sizes).

[5] Defendants note that the 2013 permit under which the snowy owls were killed, and which was the initial subject of this suit, has since been superseded by a renewed permit. *See* DE 37 (providing notice of June 11,

The MBTA is the federal legislation implementing bilateral treaties made with Canada, Mexico, Japan, and Russia (as the successor to the USSR), all concerning species of migratory birds. The MBTA makes it illegal to kill, sell, capture, take, or perform a variety of other activities interfering with migratory birds covered by those treaties "[u]nless and except as permitted by regulations" promulgated under the provisions set out in the law. 16 U.S.C. § 703(a). As relevant here, the MBTA delegates authority to the Secretary of the Interior to write those regulations. *See id.* § 704(a).

The implementing regulations for the MBTA provide two different ways for the Secretary of the Interior to allow the taking of migratory birds: 50 C.F.R. § 21.41 provides authority for the Secretary to issue depredation permits, and § 21.42 provides authority for the issuance of depredation orders.

Here, it is undisputed that FWS has authorized emergency killing under both the 2013 and 2014 permits, and not under depredation orders. The 2013 permit's section D enumerates migratory birds allowed to be killed (with specific numbers by type), but its section E then creates an emergency exception, as follows:

> You are authorized <u>in emergency situations only</u> to take, trap, or relocate any migratory birds, nests and eggs, including species that are not listed in Condition D (except bald eagles, golden eagles, or endangered or threatened species) when the migratory birds, nests, or eggs are posing a direct threat to human safety. A direct threat to human safety is one which involves a threat of serious bodily injury or a risk to human life.
>
> You must report any emergency take activity to your migratory bird permit issuing office by **FAXING to 413-253-8424** within 72 hours after the emergency take action. Your report must include

---

2014 renewal). However, it is undisputed that while the renewed permit is not identical to the original one, it still authorizes the essential activities challenged in the original Complaint. Thus, the case is not moot.

> the species and number of birds taken, method, and a complete
> description of the circumstances warranting the emergency action.

FWS_1517 (emphases in original).

Although the 2014 permit preserves the emergency exception, it also substantially increases the post-hoc reporting requirements. The first paragraphs are identical, but the reporting requirements in the second paragraph are increased:

> You must report any emergency take activity to your migratory bird permit issuing office by **FAXING to 413-253-8424** within 72 hours after the emergency take action. Your report must include the species and number of birds taken, the method of take, and a complete narrative description of the circumstances under which you determined an emergency existed. In doing so, you shall discuss species behaviors that created the hazard or risk being addressed; location of the birds relative to the aircraft or airport operations; duration of bird presence in the area where the emergency existed; timing and amount of practical non-lethal measures attempted prior to the lethal take, as well as results.

FWS_2171 (emphasis in original).

FoA contends that the structure of the regulations makes clear that this emergency authorization in a depredation permit is improper; instead, FoA argues, emergency takes can only be covered by depredation orders.

A depredation *permit* is generally "required before any person may take, possess, or transport migratory birds for depredation control purposes." *Id*. § 21.41(a). A permit may be issued only after a party petitions the Secretary with an array of information, including specifically "(1) A description of the area where depredations are occurring; (2) The nature of the crops or other interests being injured; (3) The extent of such injury; and (4) The particular species of migratory birds committing the injury." *Id*. § 21.41(b). The regulation also limits the means by which birds may be killed, even under a permit, and limits the duration of permits to one year. *Id*. § 21.41(c), (d).

By contrast, the Secretary may issue a depredation *order* "[u]pon the receipt of evidence clearly showing that migratory game birds have accumulated in such numbers in a particular area as to cause or about to cause serious damage to agricultural, horticultural, and fish cultural interests . . . ." *Id*. § 21.42. That regulation requires "That shooting shall be limited to such time as may be fixed by the Director on the basis of all circumstances involved" and, in addition, that the order should be promptly revoked once there is no longer "a serious threat to the area or areas involved." *Id*. § 21.42(b). The plaintiff also places great importance on a final subsection, which imposes the following condition on the Director of FWS's authority to issue a depredation order:

> (d) That any order issued pursuant to this section shall not authorize the killing of the designated species of depredating birds contrary to any State laws or regulations. The order shall specify that it is issued as an emergency measure designed to relieve depredations only and shall not be construed as opening, reopening, or extending any open hunting season contrary to any regulations promulgated pursuant to section 3 of the Migratory Bird Treaty Act.

*Id*. § 21.42(d).

As FoA points out, § 21.42 states that a depredation order "shall specify that it is issued as an *emergency measure* designed to relieve depredations only," but § 21.41 makes no mention of "emergency." FoA argues that this difference is deliberate, and that emergency killing may be approved (if at all) only under FWS's depredation order, not permit, authority.

I conclude that FoA reads too much into the language. Section 21.42's use of "emergency" to describe depredation *orders* does not rule out depredation *permits* that also authorize what might be described as emergency action against birds. Indeed, even the use of "emergency" within § 21.42 does not directly constrain FWS's authority. The word is deployed in a sentence describing how FWS's order must be presented to the public (as a short-term

14

authorization, not as a general waiver of normal hunting season restrictions). FoA's reading of the two sections seems to require that any killing required by what could be described as an emergency must be authorized by a separate depredation order. But that is too dramatic a consequence to arise from the single use of the word "emergency," and it is inconsistent with the structure of the two regulations as a whole.[6]

Instead, the key question is whether the permit issued here complied with § 21.41, the provision under which it was issued (and other provisions applicable to many types of permits, such as 50 C.F.R. § 13.42). Nothing in the language of § 21.41 forbids FWS from issuing a depredation permit that includes an emergency exception. As FoA points out, § 21.41(b) requires that an application for a permit must contain "(1) A description of the area where depredations are occurring; (2) The nature of the crops or other interests being injured; (3) The extent of such injury; and (4) The particular species of migratory birds committing the injury." But those conditions govern the application, not the permit itself (or the agency's discretion in issuing permits).

Only subsections (c) and (d) limit the agency's authority in issuing permits. Subsection (d) limits the maximum duration of a permit to one year. Subsection (c) states that permittees may kill birds only if specifically authorized; limits the means by which birds may be killed and the manner by which their bodies will be disposed of (and even then only "[u]nless otherwise specifically authorized"); and states that only persons named in the permit may act as

---

[6] In addition, despite the use of "emergency" in § 21.42, some actual depredation orders issued under that section have durations far exceeding one year, the maximum authorized for depredation permits under § 21.41. *See, e.g.,* 50 C.F.R. § 21.48 (depredation order effective in its current version on June 27, 2014 for double-crested cormorants will expire automatically on June 30, 2019); Migratory Bird Permits; Regulations for Double-Crested Cormorant Management, 68 Fed. Reg. 58022-01 (Oct. 8, 2003) (original authorization for same depredation order).

agents of the permittee. None of this language suggests that a permit cannot authorize killing in emergency circumstances.

FoA's citation to Executive Order 13186, "Responsibilities of Federal Agencies To Protect Migratory Birds," 66 FR 3853 (January 10, 2001), does not change my analysis. That order's Section 5 clearly states that the order "is intended only to improve the internal management of the executive branch and does not create any right or benefit, substantive or procedural, separately enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person." Other courts have found that this language means what it says. *See, e.g., Defenders of Wildlife v. Jackson*, 791 F.Supp.2d 96, 120-21 (D.D.C. 2011) (holding Executive Order 13186, and citing D.C. Circuit authority holding similar executive orders unenforceable in court based on similar language).

Likewise ineffective is plaintiff's citation to 50 C.F.R. § 13.42, which applies to many types of permits issued by FWS. That section states in full:

> The authorizations on the face of a permit that set forth specific times, dates, places, methods of taking or carrying out the permitted activities, numbers and kinds of wildlife or plants, location of activity, and associated activities that must be carried out; describe certain circumscribed transactions; or otherwise allow a specifically limited matter, are to be strictly interpreted and will not be interpreted to permit similar or related matters outside the scope of strict construction.

This language (which has only been cited by one federal court, *see Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1243, 1246 (11th Cir. 1998)), restricts the *interpretation* of permits. It is intended to bar a permit holder from engaging in behavior not clearly authorized by a permit. But nowhere does the section place a limit on the specificity of permits that FWS issues; instead, the section states that any authorizations that *are* specific must be construed as such.

16

Despite my conclusion that FWS's emergency permits did not exceed legal authority, I do find the 2013 permit's reporting requirements disturbingly vague. And I understand why, as a policy matter, an emergency exception that is employed too casually – as an attempt to evade the requirements of the permit itself – is not desirable. At the same time, however, the 2014 permit's increased reporting requirements (including that officials identify the nonlethal measures they first attempted, and the circumstances of the emergency) diminish this concern. Time will tell how those requirements are implemented. I am also mindful that there is a practical limit on the ability to determine in advance what measures might be necessary to keep the airport safe.

## CONCLUSION

For the preceding reasons, the defendants' motion to dismiss for lack of standing is denied, and the defendants' motion for summary judgment is granted.

So ordered.

John Gleeson, U.S.D.J.

Dated: October 3, 2014
      Brooklyn, New York